CAMDEN SECURITIES COMPANY, complainant-appellant,

*v.*

GERSON AZOFF et al., defendants; ABRAHAM MANLEY,
respondent.

[Argued October 24th, 1932. Decided January 31st, 1933.]

*Mr. Harvey F. Carr,* for the appellant.

*Mr. Samuel P. Orlando,* for the respondent.

The opinion of the court was delivered by

PARKER, J. We have been greatly hampered in our consideration of this case by the incompleteness of the printed book, purporting to present the state of the case as required by rule 19 of this court. The history of the suit is of some importance, and as we gather from the material laid before us, is as follows:

On August 23d, 1930, appellant Camden Securities Company filed a foreclosure bill setting up a bond and mortgage of Julius Richterman and wife, dated June 18th, 1919, to the Kosciusko Building and Loan Association in the sum of $3,200. The condition of the bond seems to have been carefully suppressed on the record, the bill merely stating that the principal sum, with interest, was "payable as therein provided." The bond and mortgage are not printed, nor is any abstract of either furnished, though they were marked in evidence. However, from other matter appearing in the case it is clear that they were the usual building and loan bond and mortgage, based on the holding by the mortgagors or one of them, of some sixteen shares of the twenty-fourth series of stock of the building and loan association payable by monthly dues of one dollar per share plus six per cent. interest and ten cents monthly premium. It is common knowledge that in a properly managed building and loan association, such a loan "runs out" to use the customary phrase, in eleven to twelve years, by the shares of stock pledged as collateral attaining a book value of $200 each. At that point the shares are usually paid off by cancellation of the bond and mortgage and the stock itself is canceled, having been in the possession of the association under collateral assignment throughout the loan period.

The bill further set up that on March 1st, 1920, the Richtermans conveyed, subject to the mortgage, to Gerson Azoff; that about July 15th, 1929, Azoff and wife made a second mortgage to the respondent Manley for $4,500. Two judgments are mentioned, but they are not material to the appeal. The bill goes on to say that on or about July 31st, 1930, the association assigned the bond and mortgage to one William I. Sohn, and on the same day Sohn and Azoff made "an agreement altering, modifying and changing the terms of the said bond and mortgage, so that the said bond and mortgage became due and payable one day after the date thereof." The final averment of the bill is that the whole amount of principal, with interest from July 31st, 1930, is due. So far as appears, Manley did not answer. Whether he asked to have

his mortgage audited pursuant to rule 186 of the court of chancery does not appear. It is stated in the brief that he failed to answer through oversight of his counsel. The master's report is not printed. The first final decree is not printed, but it is clear that one was signed. The colloquy of March 24th, 1931, before the late Vice-Chancellor Leaming shows that there was a petition by Manley to open the final decree, with affidavits; that these aroused the suspicion of Vice-Chancellor Leaming, who sent to the counsel his conclusions (not printed) which apparently directed the production of witnesses before him. At the time fixed, Mr. Aaron Heine, the permanent "solicitor" of the appellant, objected to oral proofs to supplement the affidavits, but was overruled by the vice-chancellor, and some sixty pages of testimony were taken, at the conclusion of which he decided that the decree would be opened. Evidently this was done, though the order opening decree is not printed. However, the case shows answer by Manley, filed April 15th, 1931, charging a conspiracy to get rid of the Manley mortgage by prosecuting the all but paid-off building and loan mortgage for its original amount. At this stage, the case was taken over by Vice-Chancellor Ingersoll, who at the conclusion of the hearing advised the decree now under review.

The following facts are among those established by the evidence: In 1929 the building and loan mortgage had run ten years. In July, 1929, the mortgage of Azoff to Manley for $4,500 was made, to secure part of $9,000 which Azoff owed Manley. Early in 1930, interest not being paid, Manley employed Mr. Wimberly, an attorney of this state, to collect the mortgage, and Wimberly took up the matter with Azoff who employed Heine. Heine communicated with Wimberly, and wrote him several letters, one of which was put in evidence but is not printed. Wimberly went to see Heine, and testifies to the following conversation with him in July, 1930, about a week after he received Heine's letter:

"Mr. Heine said to me the mortgage in question is about run out and Mr. Azoff finds it almost impossible to get any money and he wants to know if you people somehow can't

extend that mortgage or payment of that mortgage. Better still, why don't you take in the other property and forget about this mortgage?" "Well" (I said) "I will take it up with my client. I don't know as he is in a position to loan any more money, in fact, I doubt very much if he will." "All right," he said, "the fact of the matter is that the mortgage which you now hold is virtually a first mortgage, and certainly the property is worth every cent you have invested in them and infinitely more."

"*Q.* Was there anything further said by Mr. Heine during the course of this conversation as to the statement that the mortgage you held on the property is virtually a first mortgage, what further was said about that?

"*A.* As I recall it he reiterated the statement that it was virtually a first mortgage and that the B. & L. had been paid out and that Mr. Manley would soon be holding a first mortgage."

The building and loan stock had matured in February, and the mortgage on the Azoff property had been stamped and signed as canceled, ready for delivery to the borrower upon payment of $76.80 arrears. In March or April Azoff called on Wilinski, the secretary of the association, who told him that $76.80 was all that was needed to cancel the mortgage. Nothing more was seen of Azoff, but in July the witness testified Mr. Heine came to Wilinski's office and said he wanted to pay the mortgage off. Wilinski said he had it ready for cancellation, and Heine said no, he wanted it assigned; that he would prepare the assignment and have a certified check and have the mortgage paid in full. Accordingly Wilinski prepared a check of the association to Azoff for $3,123.20 ($3,200 less the $76.80), dated July 19th, which was handed to Heine on the 31st when Heine came with his own certified check to the association, dated July 31st, 1930, for $3,200 and an assignment of the building and loan mortgage and of the stock made out in the name of William I. Sohn, which was executed and delivered to Heine together with the bond, mortgage and certificate of stock, and the transaction closed as far as the association was concerned,

the practical effect being that it had delivered up the stock plus the mortgage to Heine for Sohn, for a net sum of $76.80, and at Heine's request made out a check to Azoff for $3,123.20 in exchange for Heine's check of $3,200. The check to Azoff was endorsed by Heine in Azoff's name "by Heine attorney," and by Heine personally, and passed to Heine's account.

The connection of Sohn with the matter is not very clear. The mortgage, as we have seen, was "assigned" to him, though it does not appear that he paid anything for it. He was a client of Heine. He was not sworn as a witness. The following paper was marked in evidence but is not printed, viz., the agreement of Sohn with Azoff, pleaded in the bill, the effect of which is alleged to be a change in the terms of the bond and mortgage of Richterman to the building and loan association so that it shall be "due and payable one day after the date thereof." The paper not being printed or produced at the argument, we are naturally in the dark as to its precise language.

It is obvious that the mortgage was then offered to, and accepted by the Camden Securities Company, of which Mr. Heine was the trusted solicitor; for among the exhibits are a check of that company to Sohn for $3,200, dated August 13th, 1930, endorsed "W. I. Sohn by Aaron Heine, attorney," and "for deposit only to the credit of Aaron Heine," and an assignment of the mortgage by Sohn to the securities company, dated August 14th, 1930. The bill to foreclose was filed August 23d, nine days later, and the subpœna to answer was the first notice to Wimberly, who was waiting to hear further from Heine about the interest overdue on the Manley mortgage, that there was any change in the situation. Some question was raised as to whether the Sohn signature on the assignment was written by the same person as that on the agreement with Azoff, but counsel desired to close the case, and the point was not pressed.

Both vice-chancellors were strongly impressed with the indications of fraud; and we think those impressions were well-founded. As Vice-Chancellor Leaming said at the out-

set: "Here is a case where a building and loan association held a mortgage and stock as collateral that was about to mature, and instead of letting that stock mature and canceling the mortgage by the proceeds of the stock it surrendered the stock and assigned the mortgage with the idea of keeping it alive as a straight mortgage free from the covenants which were contained in the bond. The mortgage contemplated that the stock should mature the mortgage, or satisfy the mortgage. In other words, instead of applying their collateral according to the conditions contained in the bond and mortgage, they returned their collateral to whom it was supposed to belong—— I am not quite sure that was done, but that is the theory—and allowed the mortgage to stand for the full amount of the indebtedness which it secured, and assigned it, and the effect of that was to practically destroy the value of a mortgage which has been executed, apparently, in good faith, as a second mortgage, in reliance on the fact that the prior mortgage was to be matured by the stock and was to be paid by the maturity of the stock, and the stock was, at the time the second mortgage was executed, almost matured. In other words, if the transaction is sustained the second mortgage is subordinated to the building and loan association mortgage. Not only that, but there were two judgments against the owner of the land which had been entered shortly prior to this transaction which likewise will receive no benefit from the cancellation of this first mortgage in accordance with its terms."

To put it in another way, at a time when the first mortgage had been satisfied, from any business point of view, by the maturity of the shares several months before, and Azoff, the owner of the equity, represented by Mr. Heine, was being hard pressed by Manley, the second mortgagee, Mr. Heine by an exchange of checks with the building and loan association paid off the $76.80 arrears, persuaded the trusting secretary of that association to obtain an assignment to another Heine client who obviously was a mere dummy, of the bond and mortgage and even of the building and loan stock which had matured. Then, on the fact of things, Sohn sold to the

appellant company the mortgage, bond and stock for $3,200 less a discount of some amount not clearly appearing. The transaction reeks of fraud on its very face, and the conduct of Mr. Heine both as a solicitor in the cause and on the witness-stand, shows a settled determination on his part to prevent the court from getting at the facts. Both vice-chancellors properly considered his refusal to testify on various points as indicative of fraud; and even though in some cases he may have been protected by attorney's privilege, the plea of privilege in most of them looks like a mere subterfuge to conceal a fraudulent transaction. The omission of so many important exhibits from the printed case is an important additional circumstance. See *Laure* v. *Singer, 100 N. J. Law 98, 103.* We recognize the rule laid down in the cases that the stock of a building and loan association is not irrevocably bound up with the mortgage in law; but in this and other similar loans it was pledged as collateral security, and if the association was to sell it and the mortgage separately it should have collected $3,200 for the matured stock (which it would have to repay on surrender thereof) and $3,200 for the mortgage. It is plain from Wilinski's testimony that no such transaction was contemplated by him. And it is still plainer from all the evidence that this unusual circumlocution was with the sole object of securing for Azoff an additional loan on the property at the expense of Manley, as well as of the judgment creditors, through the subterfuge of ostensible separation of the stock from the loan at the time when both had matured and one had in fact offset the other.

Counsel for appellant, to judge from the brief, does not undertake to argue seriously that there was no fraud on the part of Heine as to Manley. The burden of the argument seems to be that Camden Securities Company was an innocent purchaser of the bond and mortgage, and not to be prejudiced by the fraud of its solicitor in enforcing the mortgage against Manley at its original face value. One answer is that the securities company may not enforce a contract procured by the fraud of its agent. *Reitman* v. *Fiorillo, 76 N. J. Law 815; Mick* v. *Corporation of Royal Exchange, &c.,*

*87 N. J. Law 607; Walker v. Bourgeois, 88 N. J. Eq. 124.*
Moreover, the knowledge of the agent is chargeable to the
principal whenever the principal if acting for himself, would
have received notice of matters known to the agent. *Vulcan
Detinning Co. v. American Can Co., 72 N. J. Eq. 387; Han-
ford v. Duchastel, 87 N. J. Law 205,* both cited for the ap-
pellant. It is clear that the most casual inspection of the
papers themselves by the finance committee of the appellant
at the time of the "purchase" would have disclosed that the
mortgage was a building and loan mortgage framed in the
customary language and that it was eleven years old and
should be nearly or wholly extinct in the usual course of
things; that it bore the official receipt for cancellation, sev-
eral months old; and that as against possible (and actual)
junior encumbrances the documents evinced a scheme to re-
instate it at its original face amount. The chairman of the
finance committee was a lawyer, and should have had his sus-
picions aroused at once, not to mention the other members
of the committee; but apparently nothing was done, and
everything, with a blind sort of confidence, was left to the
solicitor Heine. No one knows Sohn or asked to see him;
no one required an estoppel certificate from Azoff, so far as
appears.

The assignment by the building and loan association is not
printed, but it would be strange if it were found to contain
a covenant as to the amount due. A moment's conversation
with Wilinski, which should have been prompted by the
certificate of cancellation, would have unearthed the whole
scheme. In this aspect the case shows gross negligence, if
not worse, and it would be a travesty to call the appellant an
innocent purchaser under such circumstances.

The decree under review will be affirmed.

The foregoing opinion had been prepared, circulated to the
court and approved, and the cause was thus ripe for decision
in regular course on February 6th or earlier, when on Jan-
uary 23d the court was informed by a letter from counsel for
appellant that the parties had settled their differences, and

that a consent order of affirmance had been entered in the clerk's office on January 10th, and *remittitur* had gone down to the court of chancery after the expiration of ten days provided by rule 39. All this had been done without any knowledge thereof on the part of the court, the order having been entered as of course.

We are forced to give expression to our surprise that lawyers of the standing and experience of the counsel in this case should have permitted themselves to take such action. It is a general rule, of course, that a court looks with favor on a voluntary settlement where only the interests of the parties are involved. But there are cases, particularly in equity, where after suit begun, the court will not permit a settlement tainted by fraud or undue influence or otherwise deemed improper. *Warker* v. *Warker, 102 N. J. Eq. 382; 103 N. J. Eq. 379.* And particularly when the matter has reached the stage of appeal taken, earnestly argued and finally submitted for decision, it is out of the power of the parties, of their own motion, to enter any rule of course that will destroy or impair the control of the court over the appeal. The invariable practice has been, and must be, that if the parties come to an agreement pending appeal, and desire to end the litigation, they lay the matter before the court and ask its sanction of the proposed disposition of the matter. An appellant wishing his own appeal dismissed, applies to the court, whether on notice or by consent. We have refused, in an unreported case, to accede to a reversal by consent. In another unreported case, we set aside the dismissal of an appeal to which respondent objected. Uniformly, the practice has been that an appeal taken is not to be ended without the decision of the court or the concurrence of the court in any formal disposition thereof.

It is common practice, when appeal has been disposed of by the decision of the court, and the filing of an opinion or *per curiam* memorandum, for the counsel representing the prevailing party, to enter in the clerk's office a rule in conformity with the judgment of the court. In fact, the clerk of the court has provided a set of suitable forms for such

disposition, which are filled out and filed of record without the signature of any member of the court by way of approval thereof. But this does not mean that such rules or orders are entered as of course; for they have the preliminary sanction of the court because of its decision of the matter which, naturally, contemplates the entry of a rule or order in conformity thereto; and the attorneys and counsel are held responsible for the entry of such rule as is so conformable. The practice simply illustrates the principle above laid down, that the appeal is at all times directly under the control of the court and not to be terminated in any way without the order, permission or sanction of the court, indicated either by the filing of an opinion or by the action of the court on a motion which brings the matter up for such action.

The order of affirmance which counsel undertook to enter in this matter without the knowledge or consent of the court, and the *remittitur* based thereon, we hold to be void and of no effect as improperly entered. The court has already made an order recalling that *remittitur* and setting aside the attempted affirmance. As indicated in the opinion to which this is a postscript, we conclude that the decree should be affirmed and for the reasons stated in that opinion, which it is deemed important to place upon the files of this court; and the views just expressed on the matter of practice are also included with the opinion, to the end that there may be no misapprehension by practitioners before this court of the correlative rights and duties of court and counsel with respect to the disposition of appeals that are before us.

*For affirmance*—TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, BROGAN, HEHER, KAYS, HETFIELD, WELLS, KERNEY, JJ. 12.

*For reversal*—None.